## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DENNIS VIA,                           :

      Plaintiff,                    :

                                 Case No. 3:09cv00274

  vs.                                :

MICHAEL J. ASTRUE,                    :   District Judge Walter Herbert Rice
Commissioner of the Social                 Magistrate Judge Sharon L. Ovington
Security Administration,              :

      Defendant.                    :

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Beginning in 1972 and continuing for many years, Plaintiff Dennis Via worked various jobs such as landscape laborer, pulverizer operator, paving construction laborer, dump truck driver, hand packer, and production helper. *See* Tr. 74, 81, 100-04, 402-03. His employment was interrupted in 2001 when he suffered a heart attack. He recovered sufficiently to allow him to perform some part-time work, but physical work easily tired him out. *See* Tr. 57, 66, 80.

In December 2003 Plaintiff sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits (DIB). (Tr. 57-58). He

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

asserted that he became unable to work on June 30, 2002 due to "Type I Diabetes and Heart Condition." (Tr. 57, 80). The Social Security Administration denied Plaintiff's DIB application at each stage of administrative review.

Plaintiff brings the present case challenging the final denial of his DIB application by Administrative Law Judge Melvin A. Padilla, who found that Plaintiff was not under a "disability" as defined by the Social Security Act, *see* 42 U.S.C. §423(d), and that he consequently was not eligible to receive DIB. *See* Tr. 16-30.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #12), the administrative record, and the record as a whole.

Plaintiff seeks an Order reversing ALJ Padilla's decision and remanding this matter to the Social Security Administration for payment of DIB. The Commissioner seeks an Order affirming ALJ Padilla's decision.

## II.    <u>Plaintiff's Background</u>

### A.    <u>Insured Status, Age, and Education</u>

Plaintiff's many years of employment and contributions to the DIB program provide him with insured status under the DIB program until December 31, 2007. As a result, to obtain DIB Plaintiff had to convince the Social Security Administration that he was under a "disability" as defined by the Social Security Act on or before December 31, 2007. *See* 42 U.S.C. §423(a)(1)(A); *see also Beety-Monticelli v. Commissioner of Soc.*

*Sec.*, 343 Fed. Appx. 743, 745 (3rd Cir. 2009); *Cunningham v. Astrue*, 2010 WL 22286 at *2 (6th Cir., Jan. 5, 2010).

On the date Plaintiff applied for DIB he was forty-eight years old and was thus considered to be a "younger person" during the early years of his administrative proceedings. 20 C.F.R. §404.1563(c). On the date of the ALJ's decision in May 2007, Plaintiff was between fifty and fifty-four years old. Consequently, by that date, Plaintiff had moved into the category of a person "closely approaching advanced age" for the purpose of determining whether he was eligible for DIB. 20 C.F.R. §404.1563(d); *see* Tr. 28.

Plaintiff completed the eleventh grade in high school. (Tr. 86).

### B.   <u>Medical History</u>

Plaintiff was hospitalized from June 30, 2001 through July 3, 2001 after suffering an acute inferior myocardial infarction. (Tr. 136-45). His treatment included a cardiac catheterization with percutaneous transluminal coronary angilplasty and two stents of the right coronary artery. (Tr. 137-38, 142-43).

One year later Plaintiff underwent an exercise stress test. (Tr. 147). The results were "abnormal" showing "basal inferior wall myocardial infarction with moderate ischemia of the inferior wall." *Id*. On August 7, 2002, he underwent a heart catheterization. (Tr. 150-51). During the procedure it was observed that the "stent site in the right coronary artery in the mid-zone is patent. There is a 70% occlusion distally just before it bifurcates to posterior descending artery and proximal left ventricular branches."

3

(Tr. 151). The cardiologist recommended continuing with medical treatment instead of an undergoing "angioplasty/stenting of the distal right coronary artery...." (Tr. 152 stenting at that time. (Tr. 152). The cardiologist further recommended: "Continue with aggressive medical treatment and if symptoms persist or increase, consider doing an angioplasty of the distal right coronary artery lesion." *Id.*

Plaintiff continued to experience chest pain. (Tr. 155-57, 159-61). On September 3, 2002, he underwent an angioplasty and stenting of the lesion – which had increased from 70% to 80% – in his distal right coronary. (Tr. 159). The procedure reduced the lesion to "0% with excellent flow in the distant vessel." (Tr. 159).

In late September 2002 Plaintiff saw Dr. Chong for cardiovascular evaluation. (Tr. 173-77). An EKG showed normal sinus rhythm. Dr. Chong noted, "He reports that he no longer has any chest pain." (Tr. 173). Dr. Chong further noted, "His examination was largely unremarkable." *Id.*

On July 8, 2003, Plaintiff reported to Dr. Chong that he was experiencing chest tightness and severe fatigue. (Tr. 169). Dr. Chong wrote that a "cardiac examination was largely unremarkable." (Tr. 169). Plaintiff's EKG showed normal sinus rhythm with "LVH [Left Ventricular Hypertrophy][2] and left atrial abnormality." (Tr. 171) (footnote added). Dr. Chong's treatment plan included the following:

> First of all, Mr. Via needs to stop smoking. He was strongly

---

[2] LVH refers to Left Ventricle Hypertrophy. <u>Taber's Cyclopedic Medical Dictionary</u> at 2372 (19th Ed. 2001).

encouraged to do so.  He is known to have LV [Left Ventricle][3] dysfunction but his symptoms are out of proportion.  An echocardiogram will be repeated to assess his LV function.  He will also have a repeat stress test to assess his ischemic burden....

Plaintiff underwent a cardiac stress test on July 16, 2003, which showed an estimated ejection fraction of 74%.[4]  (Tr. 194, 283).  One week later, an echocardiogram revealed no abnormalities, and his "estimated ejection fraction [was] 60% by visual inspection."  (Tr. 192, 280).

Plaintiff returned to Dr. Chong in August 2003.  He reported to Dr. Chong that he had "much more energy and [was] able to keep up with all of his activities."  (Tr. 163).  Dr. Chong noted that Plaintiff had previously been diagnosed with diabetes and had begun treatment with insulin.  *Id*.  Dr. Chong felt that Plaintiff was "doing better" overall.  *Id*.

In October 2003 nurse Elaine Weirville wrote a brief letter documenting that Plaintiff had been diagnosed with Type I Diabetes on July 23, 2003.  (Tr. 264).  She noted, "At present, his blood sugars [were] doing very well on ... [insulin]."  *Id*.  Six months later Nurse Weirville reported that Plaintiff's diabetes was in "fairly good control," and he showed no signs of neuropathy.  (Tr. 219).

In February 2004 Plaintiff's treating family physician, Dr. Brown, briefly noted in

---

[3]  *See supra*, n. 2.

[4]  Ejection fraction is a measure of a heart's ventricular function.  Technically, it is the "ratio of stroke volume to end-diastolic volume....  Normal values for EF vary, based on differences in technique, but the normal resting EF is usually 50 to 75% of end-diastolic volume...."  The Merck Manual at 1615 (17th Ed.  1999).

form he completed for the Ohio Bureau of Disability Determinations that Plaintiff "cannot do any heavy physical labor [without] getting angina."  (Tr. 255).

In May 2004 Maria Congbalay, M.D., a physician practicing family/general medicine, *see* Tr. 248, reviewed the record at the request of the Ohio Bureau of Disability Determinations and completed a form titled, "Physical Residual Functional Capacity Assessment."  (Tr. 244-48).  Dr. Congbalay believed that Plaintiff was capable of performing light work except he could never climb ladders, ropes, or scaffolds.  (Tr. 245-46).  Dr. Congbalay also reported that Plaintiff's symptoms were attributable to a medically determinable impairment and that he was "partially credible."  (Tr. 247-48).  She explained, "He has diabetes which is controlled and has CAD with occasional CP.[5] He should be capable to do less strenuous work based on the objective evidence."  (Tr. 248)(footnote added).

In September 2004 Eli N. Perencevich DO stamped her agreement with Dr. Congbalay's opinions.  (Tr. 248).  Dr. Perencevich provided no explanation or information in support of her agreement with Dr. Congbalay's opinions.  *Id.*

On September 23, 2004, Plaintiff saw Dr. Brown due to shoulder tendonitis and limited range of motion.  (Tr. 259).  Dr. Brown referred Plaintiff to Dr. Nitz.  (Tr. 259).

Dr. Nitz determined that arthroscopic surgery would help Plaintiff's right shoulder pain (Tr. 251), and he performed this procedure in October 2004.  (Tr. 250, 305-06). One

_____

[5] CAD refers to Coronary Artery Disease.  Taber's Cyclopedic Medical Dictionary at 2370.  CP probably means Chest Pain.

week later, Dr. Nitz found Plaintiff was "doing well."  (Tr. 249).  Plaintiff reported good

range of motion and minimal shoulder discomfort, and he was tolerating physical therapy

well.  (Tr. 249).

In October 2006 Plaintiff went to the hospital with a rapid heart rate (179 beat per

minute) along with irregular heart rhythm.  (Tr. 344).  He was diagnosed with "rapid

atrial fibrillation."  *Id*.  Treatment with medication slowed his heart rate "quite nicely to

101."  *Id*.  An echocardiogram on this same day showed no abnormalities and an ejection

fraction of 60%.  (Tr. 338).  His left "ventricular cavity size and function appear[ed]

normal."  *Id*.  The final diagnosis:  "Artrial Fibrillation Coronary Artery Disease."  (Tr.

341).

The administrative record also contains records concerning Plaintiff's mental

health and his mental work abilities.  Clinical psychologist Dr. Boerger examined

Plaintiff in September 2004 at the request of the Ohio Bureau of Disability

Determinations.  Dr. Boerger diagnosed Plaintiff with depressive disorder.  (Tr. 225).  He

assessed Plaintiff's GAF[6] at 52, *id.*, indicating "moderate symptoms ... or moderate

difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with

peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, 4th ed.,

Text Revision at p. 34.

---

[6] Health care professionals use the "GAF" or Global Assessment of Functioning scale to assess a
person's psychological, social, and occupational functioning on a hypothetical continuum of mental
illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time
of the evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also*
Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

Dr. Boerger opined that Plaintiff had a moderate impairment in his ability to relate to others; a mild-to-moderate impairment in his ability to understand and follow instructions; a moderate impairment in his ability to perform simple repetitive tasks; and a moderate-to-marked impairment in his ability to withstand the stresses and pressures of day-to-day work activity.  (Tr. 225).

In September 2004 psychologist Dr. Lewin reviewed the record at the request of the Ohio Bureau of Disability Determinations.  (Tr. 227-42).  Dr. Lewin felt that Plaintiff had no limitations in eleven out of twenty categories of mental-work ability, and he had moderate limitations in seven out of twenty categories.  (Tr. 240-41).  Dr. Lewin believed that Plaintiff had marked limitations in his ability to understand, remember, and carry out detailed instructions.  (Tr. 240).  She opined that Plaintiff was capable of performing "[simple, repetitive tasks] in a low stress setting."  (Tr. 242).  She concluded that Plaintiff was credible and that Dr. Boerger's conclusions could be given controlling weight.  *Id*.

## III.  **DIB And The ALJ's Decision**

### A.  **The "Disability" Requirement**

In the mid-1950s Congress instituted the DIB program as part of the Social Security Act's broad effort "to obviate, through a program of forced savings, the economic dislocations that may otherwise accompany old age, disability, or the death of a breadwinner."  *Califano v. Boles*, 443 U.S. 282, 283, 99 S.Ct. 2767, 2769, 61 L.Ed.2d 541 (1970).  The DIB program is "contributory in nature and [is] designed to prevent public

8

dependency by protecting workers and their families against common economic hazards." *Mathews v. Castro*, 429 U.S. 181, 186 n.6, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976). Such economic hazards confront workers whose serious health problems force them into what is essentially "involuntary, premature retirement." *Id*.

DIB is available only to those who are under a "disability" within the meaning of the Social Security Act. *See* 42 U.S.C. §423(a); *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To be under a DIB-qualifying "disability," an applicant must show that he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment...." 42 U.S.C. §423(d)(1)(A). The applicant's physical or mental impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'"[7] *Bowen*, 476 U.S. at 470 (quoting 42 U.S.C. §423(d)(2)(A)).

## B. ALJ Padilla's Decision

To determine whether Plaintiff was under a DIB-qualifying disability, ALJ Padilla evaluated the evidence under the applicable five-step sequential evaluation procedure. *See* Tr. 16-30; *see also* 20 C.F.R. §404.1520(a)(4). His more pertinent findings for purposes of this case began at Step Two of the sequential evaluation.

ALJ Padilla concluded at Step Two that Plaintiff's severe impairments consisted of

---

[7] Impairments also must be expected to either cause death or last at least twelve months. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

"coronary artery disease with residuals of several prior angioplasty procedures but normal left ventricular functioning, a history of alcohol abuse with continuing use, and situational depression."  (Tr. 20).

ALJ Padilla concluded at Step Three that Plaintiff's did not have an impairment or combination of impairments that met or medically equaled the criteria of an impairment in the Listings.[8]  (Tr. 23).

ALJ Padilla next addressed Plaintiff's Residual Functional Capacity, which is an assessment of a claimant's physical and mental abilities or what he can or cannot do despite his limitations.  20 C.F.R. §404.1545; *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  ALJ Padilla assessed Plaintiff's Residual Functional Capacity at Step Four as follows:

> "[T]he claimant has the residual functional capacity to perform the basic exertional requirements of light level work.[9]  However, the claimant cannot climb ladders, ropes, and scaffolds or otherwise work at unprotected heights.  The claimant is also restricted to low-stress, simple, repetitive tasks which do not involve production quotas, teamwork, more than minimal contacts with co-workers or supervisors, or any interpersonal contact with members of the general public."

(Tr. 23) (footnote added).  ALJ Padilla also concluded at Step Four that Plaintiff could perform his past relevant work as a hand packager.  (Tr. 27-28).  Although this conclusion

---

[8]  The Commissioner's Regulations contain the Listings at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[9]  Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

meant that Plaintiff was not under a DIB-qualifying disability,[10] ALJ Padilla alternatively

considered the evidence at Step Five of the sequential evaluation. (Tr. 28)

ALJ Padilla concluded at Step Five that Plaintiff retained the ability to perform

other jobs available in significant numbers in the national economy. (Tr. 29).

The ALJ's findings throughout his sequential evaluation led him to ultimately

conclude that Plaintiff was not under a DIB-qualifying disability.

## IV.    Discussion

### A.    Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Commissioner of Soc. Sec*., 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains

evidence contrary to those factual findings. *Rogers v. Commissioner of Soc. Sec.*, 486

F.3d 234, 241 (6th Cir. 2007); *see Her v. Commissioner. of Soc. Sec*., 203 F.3d 388, 389-

90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-

evidence standard is met – that is, "if a 'reasonable mind might accept the relevant

---

[10] *See* 20 C.F.R. §404.1520(a)(4)(iv) ("If you can still do your past relevant work, then we [the Social Security Administration] will find that you are not disabled."); *see also* §404.1520(f).

evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting

*Warner v. Commissioner of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial

evidence consists of "more than a scintilla of evidence but less than a preponderance..."

*Rogers*, 486 F.3d at 241.

       The second line of judicial inquiry – reviewing for correctness the ALJ's legal

criteria – may result in reversal even if the record contains substantial evidence

supporting the ALJ's factual findings.  *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d

647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746 and citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541,

546-47 (6th Cir. 2004)).

       **B.**    **<u>Analysis</u>**

       Plaintiff contends that the ALJ erred by crediting the opinions of Drs. Congbalay

and Perencevich, two non-examining, record-reviewing physicians for the Ohio BDD.

Plaintiff also contends that the ALJ also erred by substituting his own lay medical opinion

rather than sending Plaintiff for a medical consultative examination or obtaining opinions

from a medical expert who could have reviewed the entire record and testified during the

ALJ's hearing.

       The Commissioner maintains that substantial evidence supports the ALJ's

assessment of Plaintiff's Residual Functional Capacity.  This is especially so, according to the Commissioner, because "Plaintiff experienced normal cardiac functioning outside of a few isolated episodes, none of which resulted in disabling limitations."  (Doc. #10 at 60).  The Commissioner further argues that the ALJ properly relied on the opinions of Drs. Congbalay and Perencevich rather than calling upon a medical expert to provide experts opinions.

Social Security Regulations and case law require ALJs to apply controlling weight to a treating medical source's opinion when it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *See* 20 C.F.R. §404.1527(d)(2); *see also Rabbers*, 582 F.3d at 660; *Rogers*, 486 F.3d at 242; *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If a treating medical source's opinion is not entitled to controlling weight, it must be weighed under "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242.

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. §404.1527(d)(1).  However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views nonexamining sources "as highly

qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as opinions of treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f); *see also* Ruling 96-6p at *2-*3.

ALJ Padilla grounded his consideration of the medical source opinions along with his assessment of Plaintiff's Residual Functional Capacity on the application of the correct legal criteria and on substantial evidence. In doing so, the ALJ reasonably determined that Plaintiff's cardiac impairments, his shoulder injury and surgery, and depression did not impose limitations that precluded a reduced range of light work. *See supra*, §III(B).

Substantial evidence supports the ALJ's conclusion that Plaintiff experienced normal cardiac functioning outside of a few isolated episodes, none of which resulted in disabling limitations. The ALJ first accurately noted that Plaintiff underwent surgery in July 2001 and had two stents put in, after suffering a heart attack. (Tr. 20, 136-41).

Plaintiff followed up this surgery by seeing his treating cardiologist, Dr. Chong. Objective testing showed minimal cardiac abnormalities. Cardiac stress testing on June 21, 2002 showed an ejection fraction of 59%, and Plaintiff was able to reach 88% of his maximum heart rate and 10.1 METS during exercise testing. (Tr. 204). The ALJ

14

properly relied on such objective medical evidence to support his assessment of Plaintiff's cardiac impairments and resulting work abilities and limitations. *See* 20 C.F.R. §404.1528.[11]

Although Plaintiff subsequently experienced chest pain and underwent an angioplasty and stenting on September 3, 2002, the medical record again failed to support disabling limitations. (Tr. 23, 155-57, 159-61). During a follow-up examination with Dr. Chong on September 25, 2002, Plaintiff had normal cardiac functioning. (Tr. 23, 173, 177).

On July 8, 2003, Dr. Chong gave Plaintiff another cardiac examination and characterized it as "largely unremarkable." (Tr. 168). Dr. Chong determined that Plaintiff's complaints of chest tightness and severe fatigue were "largely out of proportion" with his impairments. (Tr. 168-69, 172). By August 2003 Dr. Chong felt Plaintiff was "doing better"; Plaintiff himself noted that he had "much more energy and [was] able to keep up with all of his activities." (Tr. 163).

Several years later, in October 2006, Plaintiff was also diagnosed with atrial fibrillation after being hospitalized. (Tr. 344). Yet the treatment record shows that this episode was very brief; Plaintiff's heart quickly returned to normal (sinus) rhythm after he was put on medication. (Tr. 325, 341, 344-45). An echocardiogram on this same day showed normal cardiac functioning and no abnormalities. (Tr. 338).

---

[11] As the ALJ noted, medical literature indicates that individuals with an exercise capacity of 7-9 METS tend to be able to perform heavy physical activity such as climbing stairs, sawing wood, or heavy shoveling. (Tr. 20).

Turning to Plaintiff's challenges to the ALJ's reliance on the opinions of Dr. Congbalay and Perencevich, his challenges lack merit. The ALJ found these physicians' opinions consistent with Plaintiff's "treatment history and post-angioplasty electrodiagnostic testing...." (Tr. 23). In doing so the ALJ applied the correct legal criteria when crediting the opinions of Drs. Congbalay and Perencevich. *See* 20 C.F.R. §404.1527(d)(4). Dr. Congbalay, moreover, supported her opinion that Plaintiff could perform a limited range of light work with an explanation based on medical evidence of record. (Tr. 245-46, 248). She considered the severity of Plaintiff's Type I diabetes and heart problems; she observed that Plaintiff's diabetes was controlled with therapy; she recognized that Plaintiff had suffered a myocardial infarction in June 2001 with resulting surgery; she understood that Plaintiff underwent the stenting procedure again in September 2002; she observed that the July 2003 echocardiogram showed Plaintiff's left ventricular ejection fraction at 60%; and she noted that a stress test was negative for ischemia. (Tr. 244-45). The ALJ also correctly recognized that Dr. Congbalay's opinions were consistent with Dr. Chong's progress notes and the results of cardiac stress testing. (Tr. 23, 244-45).

Plaintiff contends that because neither Dr. Congbalay nor Dr. Perencevich considered the atrial fibrillation that occurred in October 2006, a medical expert or consultative examination was needed to determine if Plaintiff suffered additional work-related limitations. This contention lacks merit. Plaintiff overlooks the medical evidence showing that after medication, Plaintiff's atrial fibrillation subsided as indicated by his

16

heart rate returning returned to normal sinus rhythm and that Plaintiff reported that he "[felt] fine." (Tr. 325). Plaintiff's physicians, moreover, did not restrict his activities and the record shows no follow-up treatment. Consequently, the medical evidence about atrial fibrillations does not conflict with the opinions of Drs. Congbalay and Perencevich or the ALJ's assessment of Plaintiff's Residual Functional Capacity. The record, moreover, does not contain the opinion of a treating physician directly conflicting with Dr. Congbalay's opinions or the ALJ's assessment of Plaintiff's Residual Functional Capacity. Because of this, the ALJ did not need to obtain additional medical testing or expert medical opinion to either (1) resolve a conflict in the medical evidence or opinions in the record or (2) to interpret the medical records beyond the information provided by Dr. Congbalay.

Plaintiff also contends that the ALJ erred by finding that he did not have a severe shoulder impairment at Step Two of the sequential evaluation. This contention lacks merit. Substantial evidence supports the ALJ's Step-Two finding that Plaintiff did not have a severe shoulder impairment. As the ALJ noted, Dr. Nitz examined Plaintiff just one week after his shoulder surgery and determined he was doing well, had good range of motion, and was tolerating physical therapy well. (Tr. 22, 249). The administrative record, moreover, did not indicate that Plaintiff received any further treatment or testing for his shoulder. Therefore, based on the lack of further treatment, the ALJ reasonably determined that Plaintiff fully recovery with no complications. (Tr. 22).

In addition, assuming that the ALJ erred at Step Two as Plaintiff asserts, such error

17

was rendered harmless by the ALJ's other findings at Step Two and his consideration of the record at each of the remaining Steps of the sequential evaluation.  *See Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008); *see also Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir. 2007).

Plaintiff lastly argues that the ALJ erred by rejecting Dr. Boerger's opinion that Plaintiff was moderately-to- markedly limited in his ability withstand the stress of work.

The ALJ found that Plaintiff required several work-related limitations because of situational depression.  He based this finding on the opinions of Dr. Boerger and Dr. Lewin.  (Tr. 25-26).  Both medical sources determined that Plaintiff experienced moderate limitations and needed certain restrictions but neither found Plaintiff to be precluded from all work activity.  (Tr. 221-26, 240-42).

In discussing Dr. Boerger's opinion that Plaintiff was moderately-to-markedly impaired in his ability to withstand work stress, the ALJ noted that he "may have been influenced by [Plaintiff's] false allegations that he had had three heart attacks."  (Tr. 25). Plaintiff reads the ALJ's comment as meaning that he rejected Dr. Boerger's restrictions. Instead, contrary to Plaintiff's argument, the ALJ largely credited Dr. Boerger's opinions by limiting Plaintiff to "low-stress, simple, repetitive tasks which do not involve production quotas, teamwork, more than minimal contacts with co-workers or supervisors, or any interpersonal contact with members of the general public."  (Tr. 23). This was also consistent with same low-stress limitation recommended by Dr. Lewin. (Tr. 242).

18

The ALJ also correctly found minimal evidence in the record of depressive disorder, except for the opinions of Drs. Boerger and Lewin.  (Tr. 25).  Plaintiff went to two counseling sessions with therapist Nancy Hallman in February 2005.  (Tr. 316-18).  Ms. Hallman diagnosed Plaintiff with major depression, yet they "did not progress very far in Treatment" because they only met twice.  (Tr. 316).

Additionally Ms. Hallman did not provide an opinion about how Plaintiff's alleged depression impacted his ability to perform work-related activities.  The record before the ALJ thus contained only two opinions (Dr. Boerger's and Dr. Lewin's) addressing Plaintiff's mental work abilities and limitations.  The ALJ's assessment of Plaintiff's Residual Functional Capacity accommodated the only two opinions in the record concerning Plaintiff's mental impairments and their limitations on work activities.  And, as a result, substantial evidence supported the ALJ's assessment.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final non-disability decision be affirmed; and

2.      The case be terminated on the docket of this Court.


July 9, 2010                                            s/ Sharon L. Ovington
                                                   Sharon L. Ovington
                                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).